### THE DOROTHY.

### THE ELM BRANCH.

#### (District Court, E. D. Virginia. December 19, 1918.)

COLLISION ☞75—STEAM AND SAILING VESSELS—NAVIGATING AT NIGHT.

    A steamship navigating at night without lights *held* solely in fault for collision with a schooner, for failing to see the latter's lights until a mile distant, when she showed her own lights, and for continuing her course and speed after she observed that the schooner was wearing ship.

In Admiralty. Libel for collision by William C. Reid, managing owner of the American schooner Dorothy, against the British steamship Elm Branch, with cross-libel. Decree for libelant.

Hamilton Anderson, of New York City, and John W. Oast, Jr., of Norfolk, Va., for the Dorothy.

Hughes, Little & Seawell, of Norfolk, Va., for the Elm Branch.

WADDILL, District Judge. A few minutes after midnight of the 26th of June, 1917, a collision occurred between the schooner Dorothy and the British steamship Elm Branch, off the northwest coast of Haiti; the libelant, the Dorothy, describing the same as happening about 35 miles northerly of Mole St. Nicholas, and the cross-libelant, the Elm Branch, about 28 miles from Cape Maysi.

The Dorothy was a four-masted American schooner, on a voyage from Puerto Columbia to Monte Christo, light, to secure a cargo from the last-named port to New York. The Elm Branch was a large ocean-going steamship, on a voyage from the west coast of Africa, through the Panama Canal, via Kingston, to Norfolk, Va., for orders.

The Dorothy's case is that at the time of the collision the weather was clear, with a strong wind from east of north, and high seas running; that she was sailing on the port tack, and concluded, after carefully searching for vessels or lights in her vicinity, and finding none,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to wear ship by putting her helm hard aport, which caused her to make a rapid swing from port to starboard, and while under the influence of the strong wind and sea, and so swinging, a white light was suddenly flashed a mile away, nearly ahead; that shortly thereafter a red light was flashed; that the schooner, which was still swinging to starboard, continued to complete the maneuver, which was the only thing she could do to bring her into the wind. Meantime the steamship was swinging from her starboard to port; that shortly thereafter the vessels reached a nearly parallel course, and came together, the bluff of the starboard bow of the steamship colliding with the bluff of the port bow of the schooner, with great force, causing serious damage.

The Elm Branch's position is that, while steering northeast half east, with her lights darkened by order of the British admiralty, and because of a wireless warning that day received as to an enemy raider in that vicinity, she sighted the green light of a sailing vessel about two points on her port bow, approximately a mile distant; that she immediately switched on her lights, the positions of the two vessels then being that the schooner was showing the steamer her green light, and the steamship showing the schooner her red light; that the steamship's helm was immediately put hard astarboard, so that the ship was proceeding to port, the sailing vessel at the time being two points on the starboard bow of the steamship; that when about half a mile apart it was observed that the schooner was apparently wearing ship, and changing her course to starboard; that previous to the latter maneuver of the schooner the positions and courses of the two vessels avoided risk of collision; that, upon the schooner changing her course, the steamship's helm was kept hard astarboard in an endeavor to bring her round and clear; but the schooner, having jibed, bore down under press of sail, struck the steamship on the starboard, bumping alongside, and causing damage to both vessels.

The conflict in the testimony in this case is not very great; indeed, the parties are in agreement as to the essential facts bearing upon the merits of the controversy. The schooner admits that, upon observing the white light of the steamer as it was flashed about a mile away, she had departed from her port tack about two points; that she thereafter rapidly fell off under the effect of the wind and sea, which she says was the only thing she could do in the circumstances; that some half minute to a minute elapsed between observing the ship's white light and her red light, that the change from red to green was from two to three minutes, and the green light showed up about a minute and a half before the collision.

The steamship, on the other hand, admits seeing the green light of the schooner about two points on her port bow when a mile away; that, without abating her speed, she starboarded and went to port; that when the vessels were about half a mile apart the schooner showed her red light, and that she still kept her speed, with her wheel hard astarboard, until the vessels came in collision; also, that her lights were covered until she had seen the green light of the schooner about a mile away, when she suddenly switched the same on, and that she had not theretofore observed the lights of the schooner.

From these undisputed facts, the court has to determine the responsibility for the collision, which is not difficult, having regard to the rules of navigation properly governing the vessels in their then situation. The steamship was charged with the duty of avoiding as well as risk of collision as collision with the schooner. She had seen the green light of the schooner a mile away, and she should have done more, considering the condition of the weather and sea, than continue full speed ahead under hard astarboard helm. The fact that the lights of the ship were not exposed to the schooner until the vessels were a mile apart should have made her the more careful in her navigation. She was charged with knowledge of the fact that the schooner had been deprived of the opportunity of earlier observing the ship's lights. Under the international rules of navigation—article 2, §§ (a), (b), and (c)—her white light should have been observed at least five miles, and her colored lights at least two miles, away. The mere fact that the placing of the ship's helm to starboard, upon observing the schooner's green light, was a proper maneuver at the moment, would not warrant her in so doing, and continuing at full speed ahead. It so happened, although the schooner was showing her green light, which indicated she was going to port, that she had actually fallen off two points from the wind on the port tack, and was wearing ship with a view of going about, and rapidly changed her course from green to red, which tended to throw the vessels together, instead of apart, making the steamship's course cross that of the sailing vessel, unless the steamship again changed her course. This risk the steamship took, by continuing at full speed ahead under her starboard helm, failing to take into account the wind, weather, and sea conditions, and possible dangers and eccentricities of the two ships navigating, with the knowledge on her part of the ignorance of the schooner's navigators as to her presence.

The steamship is, moreover, at fault for continuing at full speed ahead under her starboard helm, after observing the change of course of the schooner, while wearing ship and jibing, changing her course from green to red; the red light having made its appearance when the vessels were half a mile apart. The steamship could at that time, in the judgment of the court, have avoided the collision by hard aporting her wheel, and not continuing to port under a starboard helm; and, in any event, if there was doubt about this, she should have sounded danger signals, slackened her speed, or stopped or reversed, and not have continued on her original course full speed ahead, and across the schooner's course. The latter maneuver should certainly not have continued after the schooner's red light showed up. The schooner had the right, if, in the judgment of her navigators, it was proper, to wear ship and change from the port tack at the time she did. There was nothing to indicate that any vessel was near. The Elm Branch admits that her lights were obscured at the time, and she should not escape responsibility, or call upon others to share her losses, by finding fault with the vessel for the collision, on the theory that the latter, having departed two points from her port tack, upon seeing the steamship's white light, ought to have returned to her

port tack. The schooner says it was impracticable to do other than what she did; that is, wear ship and continue on the starboard tack. At this juncture, to have the burdened vessel, charged with avoidance of risk of collision, continue her course and speed, and relieve the schooner, the privileged vessel, from obligation to keep her course and speed, and require her to change to another course, would be to impose on her a highly improper and most dangerous act, in positive violation of the plain maritime regulations governing the situation. To hold the schooner liable for this collision, or require her to share in the loss incurred thereby, would be to reverse the well-known rules of the road governing the navigation of steam and sail vessels, by placing the burden upon the sailing vessel, the privileged one, and not the steamship, the burdened one.

Further, the steamship cannot be said to be free from fault for failing to see the lights of the schooner earlier. The regulations prescribe that the lights shall be such as can be seen two miles away. The ship's lights were obscured, but the schooner's lights were properly set and burning brightly, and ought to have been seen by the steamship before getting within a mile of her; and the ship was charged, knowing that she herself was running without visible lights, with maintaining a specially vigilant lookout for other persons lawfully navigating those waters, in order that they might not be run into.

An exceedingly interesting and important legal question was presented in this case, both by exception of the schooner to the answer and cross-libel, and upon the introduction of testimony by the steamship, as to whether the ship was not relieved from conforming to the international rules of navigation, by reason of special instructions of the British admiralty, under which it is claimed she was navigating; and the further question was raised as to whether or not this defense could be interposed, and also whether the special orders of the British admiralty were sufficiently and legally proved, to permit them to be used as evidence in this case. In the view taken by the court, assuming, though not deciding, that the contentions of the ship regarding the effect of these special regulations are binding, and the proof offered sufficient, still it does not materially affect this case, as the liability of the steamship is indisputably established from its acts of omission and commission, had in connection with her navigation as hereinbefore stated, after the presence of the schooner became known, as well as for her failure to observe it earlier.

It follows that the steamship Elm Branch is solely responsible for the collision, and a decree so ascertaining will be entered on presentation.